```
1                 UNITED STATES DISTRICT COURT

2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    OSCAR SANDOVAL,                  )
                                      )
5                  PLAINTIFF,         )
                                      )
6    V.                               ) NO. 2-17-CV-03092
                                      )
7    UNITED STATES OF AMERICA,        )
                                      )
8                  DEFENDANT.         )
                                      )
9    _____)

10

11

12           DEPOSITION OF SUSAN GILES MCCLINTOCK

13                    TUCSON, ARIZONA

14             WEDNESDAY, SEPTEMBER 11, 2019

15

16

17

18

19

20   JOB NO. 3501690

21   REPORTED BY:

22   BONNIE J. HUMM, RPR

23   CERTIFIED COURT REPORTER

24   CERTIFICATE NO. 50722

25   PAGES 1-106
```

                                              Page 1

```
 1            THE DEPOSITION OF SUSAN GILES MCCLINTOCK

 2   WAS TAKEN ON SEPTEMBER 11, 2019, COMMENCING AT 2:05 P.M.,

 3   AT 1309 EAST BROADWAY BOULEVARD, TUCSON, ARIZONA, BEFORE

 4   BONNIE J. HUMM, A CERTIFIED COURT REPORTER OF THE STATE

 5   OF ARIZONA.

 6                         *   *   *

 7   APPEARANCES:

 8        FOR THE PLAINTIFF:

 9            BERTLING LAW GROUP, INC.

10            BY PETER G. BERTLING, ESQ.

11            15 WEST CARRILLO STREET, SUITE 100

12            SANTA BARBARA, CALIFORNIA  93101

13            (805) 879-7558

14            PETER@BERTLINGLAWGROUP.COM

15

16        FOR THE DEFENDANT:

17            UNITED STATES ATTORNEY, CIVIL DIVISION

18            BY TIMOTHY D. BICHÉ,

19              ASSISTANT UNITED STATES ATTORNEY

20            300 NORTH LOS ANGELES STREET, SUITE 7516

21            LOS ANGELES, CALIFORNIA  90012

22            (213) 894-7354

23            TIMOTHY.BICHE@USDOJ.GOV

24

25        ALSO PRESENT:  TROY DORRETT, ESQ.
```

Page 2

```
 1                     I  N  D  E  X

 2    WITNESS                                          PAGE

 3    SUSAN GILES MCCLINTOCK

 4    EXAMINATION BY MR. BERTLING                         5

 5    EXAMINATION BY MR. BICHÉ                           97

 6    RE-EXAMINATION BY MR. BERTLING                    102

 7

 8

 9

10                     E X H I B I T S

11    NUMBER       DESCRIPTION                         PAGE

12    EXHIBIT A    GROUP EXHIBIT OF VARIOUS DOCUMENTS    16

13                 PRODUCED BY THE UNITED STATES,

14                 USA001026-1032, 1038, 1034,

15                 1041-1056

16    EXHIBIT B    DOCUMENT TITLED MEDICAL/SURGICAL AND  18

17                 PSYCHIATRIC REFERRAL REQUEST,

18                 CREATING A REQUEST, USA001042-1054

19    EXHIBIT C    DOCUMENT TITLED UNIT ADMISSION AND    23

20                 ORIENTATION PROGRAM CHECKLIST,

21                 USA001056

22    EXHIBIT D    EMAIL FROM SUSAN FRITZ DATED          26

23                 10-31-13 WITH ATTACHMENTS,

24                 USA001026-1032

25
```

Page  3

```
 1                  SUSAN GILES MCCLINTOCK,

 2    having been first duly sworn by the Certified Reporter to

 3    tell the truth, the whole truth, and nothing but the

 4    truth, testified as follows:

 5                          EXAMINATION

 6    BY MR. BERTLING:

 7         Q.    Would you please state your full name for the

 8    record.

 9         A.    Susan Giles McClintock.

10         Q.    Ms. McClintock, thank you for accommodating

11    your schedule to be here this afternoon.  My name is Pete

12    Bertling, and I represent an inmate who was previously

13    incarcerated at Safford FCI.  And I understand that at

14    least part of the time during his incarceration you were

15    the warden.  Is that correct?

16         A.    Yes.

17         Q.    When did you stop your job responsibilities at

18    Safford?

19         A.    I was there two times, so the time that you're

20    referring to I was the warden, and I left there in

21    December of 2014.

22         Q.    And how long had you been acting as the warden

23    prior to December of 2014?

24         A.    I was there two years.

25         Q.    So did you become the warden, then, in 2012?
```

Page 5

1    Is that what you're saying?

2         A.    Yes.

3         Q.    So why don't you run down for me, just give me

4    the CliffsNotes version of your tenure with the Bureau of

5    Prisons.  When did you start?

6         A.    I started in 1990 as a correctional officer in

7    Tucson.  Then I went to Springfield, Missouri, as a

8    safety specialist trainee.  Left there and went to Estil,

9    South Carolina, as a safety manager.

10         Q.    Let me just stop you there for a moment.  What

11    is a safety manager within the BOP nomenclature?

12         A.    I was responsible for the occupational,

13    safety, and environmental health program at the facility.

14         Q.    What else, if anything?

15         A.    That was my primary duty.  I had other

16    collateral duties, but that was my primary duty.

17         Q.    And when you talk about occupational, safety

18    and health, what kind of issues did that cover?

19         A.    It covered fire safety, environmental safety,

20    chemical control, approving chemicals to come into the

21    facility, inspections for sanitation, maintaining the

22    warehouse for sanitation supplies and safety equipment,

23    and workers' compensation.

24         Q.    When you mentioned the environmental safety,

25    could you elaborate on what you mean by that?

Page 6

```
 1   just that, keeping workers and inmates safe, that's a
 2   pretty big dedication to our resources.
 3        Q.   Let's go forward with your job
 4   responsibilities.  You were giving me the history and
 5   chronology of your employment with the BOP.  Could you go
 6   on further?
 7        A.   Sure.  I left there, and I went to Central
 8   Office where I was an evaluation specialist.  I left
 9   there and went to --
10        Q.   Can I stop you there?  Central Office, where
11   is that located?
12        A.   Washington, D.C.
13        Q.   And when did you go to Washington, D.C.?
14        A.   I went there in the spring of '97, and I left
15   in the summer of 2000.
16        Q.   And during your tenure there, what did you do?
17        A.   I was an evaluation specialist.  My primary
18   duty was I worked with facilities throughout the Bureau
19   to help them prepare for and pass accreditation with the
20   American Corrections Association and maintain that
21   accreditation.  It required reviewing files, touring
22   facilities, providing guidance, and being liaison with
23   ACA.
24        Q.   And as part of your responsibilities in
25   helping the BOP to get accreditation by the ACC, did you
```

Page 9

```
 1    do anything with regard to the medical division at the
 2    BOP and helping that segment of the BOP at a particular
 3    facility to get their accreditation by ACC?
 4         A.   Well, ACA is --
 5         Q.   ACA.  I'm sorry.  Excuse me.
 6         A.   ACA is a facility accreditation.  I think what
 7    you're referring to is JCAHO, which is Joint Commission
 8    on Accreditation of Healthcare, which is a medical
 9    accreditation.
10         Q.   Well, actually I'm familiar with both of them,
11    but doesn't ACA also, as part of their inspections, look
12    at the physical plant and things of that nature?
13         A.   They do.  There are standards with that.  But
14    that would have been the same as helping any department
15    within that facility.  So I never went out specifically
16    just to look at medical.
17         Q.   Okay.  That's what I was trying to clarify.
18              Now, what about did you do anything to
19    help with compliance with JCAHO?
20         A.   At the facility I worked in, yes.
21         Q.   And which facility are you referring to?
22         A.   Estil.
23         Q.   So let's go back to 2000.  You leave Central
24    Office in Washington, D.C, and where do you go?
25         A.   Butner, North Carolina.
```

Page 10

1      Q.    When did you leave there?

2      A.    I left there in 2007.

3      Q.    And what were your job responsibilities in

4   North Carolina?

5      A.    Camp administrator.

6      Q.    What does that mean?

7      A.    I was the eyes and ears for the warden at a

8   satellite camp.

9      Q.    And when you're talking about a satellite

10  camp, for example in Lompoc they have a camp and they

11  have two other divisions.  Are you talking about that

12  type of camp or something different?

13     A.    Similar.

14     Q.    And what was your job responsibility?  You

15  were the eyes and ears for the warden for what purpose?

16     A.    Primarily for unit team.  There was no unit

17  manager there, so I filled in as running the unit team

18  and then oversaw the general operations.  So if I saw

19  that there was a problem, for example in food service, I

20  would talk either to the staff there or, if I felt like I

21  needed to elevate it, I could speak to the associate

22  warden that was responsible for food service.

23     Q.    Food service is one example.  Did you have any

24  oversight or involvement with medical?

25     A.    The same type of oversight.

Page 11

```
 1    so I would not have been drafting them or reviewing them

 2    for technical accuracy.

 3         Q.    What did you do after 2007?

 4         A.    Then I went to Morgantown as associate warden.

 5         Q.    Where is Morgantown?

 6         A.    West Virginia.

 7         Q.    How long were you there?

 8         A.    A year and a half.

 9         Q.    What were your job responsibilities as an

10    associate warden?

11         A.    At that facility I supervised all departments

12    except UNICOR, which is an industrial division within the

13    Bureau of Prisons.

14         Q.    When you say you supervised all divisions,

15    would that include medical treatment and care provided to

16    inmates?

17         A.    Yes.

18         Q.    How did you carry out that supervisory

19    responsibility?

20         A.    They had a health services administrator and a

21    clinical director and a chief dental officer that dealt

22    with the medical care, and I supervised them.

23         Q.    How did you carry out your job

24    responsibilities of supervising the HSA?

25         A.    It was primarily reviewing budget requests,
```

Page 13

```
1    and he has the authority to -- authority and

2    responsibility to provide direction, and in my position I

3    had the responsibility to follow that direction.

4         Q.    Where did you go after West Virginia?

5         A.    I went to Safford.

6         Q.    And so what was your first job responsibility

7    at Safford when you went there?  Would this be in 2008?

8         A.    2007.

9         Q.    Thank you for the clarification.

10               So when you arrive at Safford in 2007,

11   what is your initial job responsibility?

12        A.    Associate warden.

13        Q.    And was it any different at Safford regarding

14   the responsibilities than at West Virginia?

15        A.    No.

16        Q.    So essentially the same thing at Safford?

17        A.    Correct.

18        Q.    And how long did you carry out the job

19   responsibility as an associate warden at Safford?

20        A.    I was there about a year and a half.

21        Q.    And so would that put us into 2009?

22        A.    It was late 2008.

23        Q.    And did you leave at late 2008?

24        A.    Yes.

25        Q.    Why did you leave?
```

Page 15

1        A.    I transferred to the complex in Tucson as

2    associate warden.

3        Q.    And then did you go back to Safford at some

4    point?

5        A.    Yes.

6        Q.    When did you go back?

7        A.    I went back there in 2012.

8        Q.    Why was the change?

9        A.    I got promoted.

10        Q.    To warden?

11        A.    Correct.

12        Q.    Congratulations.

13        A.    Thank you.

14        Q.    So what was your responsibility then as a

15    warden versus an associate warden?

16        A.    It's more removed from the day-to-day

17    operations, and it's a broader scope of supervision over

18    the facility.

19        Q.    In 2014, who essentially reported to you?

20        A.    Everyone at the facility.

21            (Marked for Identification:

22            Deposition Exhibit A)

23    (By Mr. Bertling)

24        Q.    Now, I want to show you what's been marked as

25    Exhibit A.  And I'll just represent to you, Ms.

                                            Page 16

1    that's at page 1027, 1028?

2        A.    No.

3        Q.    Same thing with regard to pages 1029 and 1030.

4    Do you recall ever seeing any of -- or this A&O Lesson

5    Plan?

6        A.    No.

7        Q.    Did you have anything to do with making sure

8    that this A&O Lesson Plan was shared with the inmates?

9        A.    No.

10       Q.    Whose responsibility would that have been?

11       A.    That would have been the health services

12   administrator, infectious disease coordinator.  And once

13   it had been put in the A&O lesson plan, then the A&O

14   coordinator would have made sure that it was all in the

15   file.

16       Q.    With regard to the infectious disease

17   coordinator at Safford in 2014, who would that have been?

18       A.    Kyle Garcia.

19       Q.    Do you know how long Mr. Garcia had been there

20   prior to 2014?

21       A.    He was a nurse when I got there in 2007, and

22   at some point he got promoted to infectious disease

23   coordinator.  I don't recall when that was.

24       Q.    What were his responsibilities as the

25   infectious disease coordinator?

Page 41

```
 1        A.    He coordinated all activities around

 2  infectious diseases.

 3        Q.    What are the kinds of things he would do, if

 4  you know?

 5        A.    Monitor tuberculosis, hepatitis C patients,

 6  the flu.  He also did studies for the governing body

 7  committee.
```

```
 8        Q.    Anything else that you're aware of?

 9        A.    I'm sure there were other duties, but I can't

10  recollect them specifically.

11        Q.    Ms. McClintock, are you aware of ever having

12  personally been named as a defendant in a lawsuit that

13  was filed by an inmate that addressed the issue of valley

14  fever?

15        A.    No.

16        Q.    You've never been provided any notification of

17  that?

18        A.    Correct.

19        Q.    Do you know whether or not there have been any

20  lawsuits where you were named as a warden in a lawsuit

21  filed by an inmate who had developed Valley Fever at

22  Safford?

23        A.    No.

24             MR. BERTLING:  In the packet I'm going to

25  mark Exhibit E.
```

Page 42

```
 1        A.    I don't know.
 2   (By Mr. Bertling)
 3        Q.    Do you know if anything was done?
 4              MR. BICHÉ:  Same objections.
 5        A.    (Witness shakes head.)
 6   (By Mr. Bertling)
 7        Q.    Is that no?
 8        A.    That's a no.
 9        Q.    Would you have expected that they would be
10   notified about it?
11        A.    After the memo that you showed me that I don't
12   remember, I would have expected something to have been
13   done based upon that and these emails.
14        Q.    And what would you have expected to be done?
15        A.    I would have expected the content, the
16   intentions of those directives to have been followed out.
17        Q.    And with regard to warnings or ways people
18   could prevent being exposed to the valley fever spores,
19   what would you have expected to be done?
20              MR. BICHÉ:  Objection.  Calls for
21   speculation.  Lacks foundation.
22              If you know, you can answer.
23        A.    I mean, it's in the air, so there's very
24   little that can be done other than to keep the dust down
25   and keep it clean, keep the place clean.  And we kept it
```

Page 58

1    clean anyway, so I don't know what else could have been

2    done.

3    (By Mr. Bertling)

4        Q.    And let's talk about that, because I'm glad

5    that you brought up the issue about keeping it clean.

6    Who kept it clean?

7        A.    Inmates cleaned.

8        Q.    Were they called orderlies?

9        A.    Some were, yeah.

10       Q.    And when these inmates would be cleaning the

11   dust and the dirt, what was being done to help them

12   prevent from inhaling the spores that might be carried by

13   that dirt?

14       A.    The method that they would clean would prevent

15   airborne dust particles.  They would -- for example, they

16   would use a dust mop before they would do anything else.

17   They would dust mop it.  Then they would wet mop it.

18   Rinse the mop out.  That collects the dust, washes it

19   through water, and then it gets dumped out.  We had a

20   very vigorous cleaning program at Safford.

21       Q.    So let's talk about that cleaning program.  Is

22   that how Mr. Sandoval was taught to clean at Safford?

23             MR. BICHÉ:  Objection.  Calls for

24   speculation.  Lacks foundation.

25       A.    I don't know how he was trained.

                                              Page 59

1        A.      It would depend on the department that he was

2    assigned to and the staff that supervised him.

3        Q.      So, for example, an orderly who was required

4    to clean the unit where he lived, what would they be

5    trained?

6        A.      You'd have to ask the person that trained

7    them.

8        Q.      Who would that have been?

9        A.      It would depend on the unit.

10       Q.      Do you have any idea what they would have been

11   trained?

12              And the reason I'm asking this,

13   Ms. McClintock -- I'm not trying to be argumentative --

14   you just identified a very detailed process about how

15   people would do the wet mopping and they would do

16   different things.  How do you know that that was being

17   trained to the actual people who were required to do the

18   cleaning?

19              Because you seem pretty proud of the fact

20   that you kept the place so clean, and I'm just trying to

21   find out how do you know that your inmates were trained

22   to do it that way?

23       A.      I worked for the Bureau of Prisons for about

24   27 years.

25       Q.      Right.

Page 61

1          A.      And it is done the same way everywhere.   It is

2     a standard that you dust-mop a floor before you put any

3     water on it.   You get up all the particles.   And then you

4     would wet-mop it.   When it was completely clean and there

5     was no sand or dirt on there, if they were going to buff

6     the floor, then they would buff it.

7                  And if you tried to deviate from that, a

8     head orderly would take you outside and tell you not to

9     mess with his floor, because it will ruin the floor.   So

10    inmates come up with this procedure and they train each

11    other.   It's an institutional process.

12         Q.      How is dust mopping done?

13         A.      There is a large dust mop, maybe three feet

14    wide, on a handle.   And they go through and go under all

15    the surfaces and around all the surfaces and gather up as

16    much dust and particles as they can prior to wet mopping.

17         Q.      And so as part of that process, do you know if

18    spores or the dust can make people sneeze from inhaling

19    it?

20                 MR. BICHÉ:   Objection.   Calls for

21    speculation.   Lacks foundation.

22    (By Mr. Bertling)

23         Q.      Do you know?

24         A.      I don't know.

25         Q.      In the housing itself where Mr. Sandoval was

Page 62

1     Q.    And what did the individual units look like?

2     A.    They were comprised of cubicles with partial

3  walls that contained several bunk beds per cubicle.

4     Q.    And were there restrooms within the building

5  itself?

6     A.    Yes.  In the back.

7     Q.    How do you get to the restroom?

8     A.    You go through the run, through the individual

9  dorm area into the back area, what I just referred to as

10  the runway.

11     Q.    Do you have to go outside to get to the

12  restrooms?

13     A.    No.

14     Q.    When you were warden there, at any time was

15  there building being done within the different units?

16     A.    Was there construction?  Is that what you're

17  asking?

18     Q.    Construction, yes.

19     A.    Yes.

20     Q.    What kind of construction was being done

21  within the units themselves?

22     A.    Showers were being remodeled.

23     Q.    What else, if you recall?

24     A.    That's all I recall right now.

25     Q.    Now, with regard to the doors to those units,

Page 64

1    the exterior doors, was there any gap between the ground

2    and the door where particles could come in?

3         A.    Should not have been.

4         Q.    Why not?

5         A.    Because it's a security issue.

6         Q.    Okay.  Do you know whether there were?

7         A.    I would have known if there was a security

8    issue and there were gaps in the doors.  So I would have

9    to say there were not gaps in the doors.

10        Q.    Did you ever learn that inmates would actually

11   take anything to prevent dust from coming in from under

12   the door into these units?

13        A.    No.

14        Q.    You were never notified of that?

15        A.    No.

16        Q.    You never became aware of that?

17        A.    No.

18        Q.    Would you have expected to have been notified

19   of that?

20        A.    Possibly.

21        Q.    Why only possibly?

22        A.    Because if someone saw it, they would have

23   taken care of it.  It wouldn't necessarily have to rise

24   to the warden.

25        Q.    You're making the assumption that it would

                                              Page 65

1    have been taken care of; is that correct?

2         A.    Yes.

3              MR. BICHÉ:   You're making the assumption

4    that it happened, so that seems fair.

5    (By Mr. Bertling)

6         Q.    Let's just assume that it happened.   You made

7    the assumption that it would be taken care of.   Why would

8    you make that assumption?

9         A.    Because that's what staff are there to do.

10        Q.    And you would expect them to carry out their

11   jobs and their responsibilities; is that correct?

12        A.    Yes.

13        Q.    Was there any time that you would do any kind

14   of physical inspection of the unit yourself to make sure

15   that things were the way they should be?

16        A.    Yes.

17        Q.    Under what circumstances?

18        A.    I did them when I first got there because the

19   institution was not being kept up to the standards that I

20   believe they should be.   And once we got up it up to our

21   standard, then I would do inspections once a week.

22        Q.    When you first got there, what wasn't being

23   kept up to the standards?

24        A.    Too much property; things being stored under

25   the bunks that shouldn't be there.   Wasn't being cleaned

Page 66

1     to the standard that I thought it should be kept to.

2          Q.     Anything else?

3          A.     Those are the basics.

4          Q.     Did you ever supervise or see -- I don't think

5     you'd be supervising, but did you observe how inmates or

6     orderlies would clean the different units?  And I'm

7     talking about the housing units.

8          A.     They would be cleaning when I would be going

9     through there.

10          Q.     Okay.  And what percentage of the time would

11    inmates typically spend in the housing units during the

12    day?

13          A.     It varied.

14          Q.     Under what circumstances?

15          A.     If they worked, what shift they worked, how

16    many days they worked.  If they had medical conditions.

17    The weather, if they wanted to be inside or outside.

18          Q.     With regard to somebody who was a barber,

19    where was the barber facility located?

20          A.     We moved it during my time there.  It was on

21    the center compound, and then we moved it to the

22    recreation yard.

23          Q.     Why did you move it?  Why did you move it to

24    the recreation yard?

25          A.     To enlarge it.

Personal Court Reporters, A Veritext Company
818-988-1900

```
 1          Q.    And what was the exposure to the outside?

 2    What was the exposure of the barbershop, after it was

 3    moved, to the outside?

 4          A.    It was in a newly remodeled building.

 5          Q.    And was there air conditioning in there?

 6          A.    Yes.

 7          Q.    Were there filters?

 8          A.    Yes.

 9          Q.    What kind of filters?

10          A.    I don't know.

11          Q.    What about in the housing units; do you know

12    what kind of filters, if any, were in there?

13          A.    There would have been filters because it was

14    all air conditioned, and the filter would be determined

15    by the size of the air conditioner and the maintenance

16    schedule that was required for it.

17          Q.    Do you have any information about the type of

18    filters that were being used in 2014?

19          A.    No.

20          Q.    Do you know who would have that information?

21          A.    The facilities department would have that

22    information.

23          Q.    With regard to the cleaning of the units, the

24    housing units, was there a description of how that should

25    be done or what should be cleaned as part of that job?
```

Personal Court Reporters, A Veritext Company
818-988-1900

```
 1         A.    I don't know how it would have been described.

 2         Q.    Were inmates required to work?

 3         A.    Yes.

 4         Q.    Why?

 5         A.    That's part of the program is to assign them

 6    all jobs and keep them occupied.

 7         Q.    If they're not physically able to work, were

 8    they required to work?

 9         A.    No.

10         Q.    If somebody was sick, you wouldn't expect them

11    to work, correct?

12         A.    I would expect for them to be cleared from

13    medical to be approved to be off of work.

14         Q.    So if an inmate was only able to work one or

15    two days a week, you would become aware of that; is that

16    correct?

17         A.    No.

18         Q.    Would anybody?

19               Who would become aware of that?

20         A.    Well, medical would be aware of it, and the

21    detail supervisor would be aware of it, and the housing

22    unit staff would be made aware of it.

23         Q.    But you, as the warden, wouldn't be made aware

24    of that?

25         A.    No.
```

Page 69

1    Q.    While you were the warden at Safford, were you

2   ever made aware of any inmates having been diagnosed with

3   valley fever?

4    A.    No.

5    Q.    Would you have expected to have been notified?

6    A.    Not necessarily.

7    Q.    Why not?

8    A.    Because I'm not notified of every diagnosis

9   there.

10    Q.    Okay.  So you have no recollection of ever

11   being notified how many inmates were diagnosed with

12   valley fever; would that be accurate?

13    A.    That's accurate.

14    Q.    Would you review any kind of documentation

15   that was being published about that?

16    A.    The only time I would have been was if

17   Mr. Garcia would have done a study for the governing

18   body.  And then I would have reviewed it during the

19   governing body meeting if I was able to attend.  But

20   otherwise no.

21    Q.    Were you aware that in the state of Arizona if

22   an inmate or actually any patient was diagnosed with

23   valley fever that the Department of Health was supposed

24   to be notified?

25    A.    No.

Page 72

(By Mr. Bertling)

1

2      Q.    It goes on to say, Those exposed to dust

3   during their jobs or outside activities in these areas

4   should consider respiratory protection, such as a mask,

5   during such activities.

6            Were inmates who were working in jobs that

7   exposed them to dust given masks?

8      A.    I would say that sometimes they were.  And if

9   they would have asked for a mask, I'm sure one would have

10  been provided.

11     Q.    So under what circumstances -- you said

12  sometimes they were.  Under what circumstances were they

13  provided?

14     A.    For example, if somebody was on a landscape

15  detail and they were out cutting weeds, I would -- I know

16  I've seen people wearing particle masks.

17     Q.    Why were they wearing them, to your knowledge?

18     A.    I never asked them why.  I would assume the

19  same reason you or I would wear them if we were out

20  there.  Because we were being irritated by whatever was

21  being kicked up.

22     Q.    Was that being offered to orderlies who were

23  working inside of the buildings at all, to your

24  knowledge?

25     A.    I have no knowledge.

Page 76

```
1        Q.    Do you know why it wouldn't be?

2        A.    I don't know why it would have been or would

3   not have been.  I just know that if an individual asked

4   for it -- we had no reason to not provide it if someone

5   asked for it.

6        Q.    What kind of mask would you provide if

7   somebody asked for it?

8              MR. BICHÉ:  Objection.  Calls for

9   speculation.

10  (By Mr. Bertling)

11       Q.    If you know.

12       A.    Well, as a former safety manager, it would

13  depend on the area, it would depend on the exposure, and

14  then it would depend on the rating of the mask.

15       Q.    So with regard to individuals who were

16  orderlies that were concerned about the dust that was

17  being kicked up as they were cleaning the different

18  housing units that would cause them to sneeze, what kind

19  of mask would they be given?

20             MR. BICHÉ:  Objection.  Incomplete

21  hypothetical.  Calls for speculation.  Lacks foundation.

22             If you know, you can answer.

23       A.    I mean, we'd have to look at it, but I would

24  assume a particle mask is what they would have been

25  given.  But you would have to ask the safety manager.
```

Personal Court Reporters, A Veritext Company
818-988-1900

1    susceptible to infection than Whites.

2              Were you aware of that information?

3        A.    No.

4        Q.    Is this the first time you've become aware of

5    that?

6        A.    Yes.

7        Q.    And you do see that this is a document that's

8    USA1413, and you understand that was produced to us by

9    the U.S. in this case?

10       A.    I understand.

11       Q.    But you weren't aware that Latinos were at

12   risk for the more severe illness; is that correct?

13             MR. BICHÉ:   Objection.

14       A.    I wasn't aware that this document claims that

15   they are.

16   (By Mr. Bertling)

17       Q.    So with regard to this document, would you

18   look at 1414, page 1414.  And there's a section talking

19   about can coccidioidomycosis be prevented.

20             Had you ever seen this prior to today?

21       A.    No.

22       Q.    Had you ever heard the general proposition

23   that, quote, general prevention lies with dust control,

24   as it regards preventing coccidioidomycosis?  Were you

25   aware of that while you were a warden at Safford?

                                              Page 82

```
 1        A.    I'm aware of it as being a person living in

 2   Arizona.

 3        Q.    And what did you do as the warden at Safford

 4   to carry out this concept of prevention lies with dust

 5   control, if anything?

 6        A.    As I already said, we had a very rigorous

 7   cleaning program at the facility inside and outside.  It

 8   wasn't geared towards this, because I was not aware of it

 9   at the time.

10        Q.    Do you know why you weren't aware of it?

11              MR. BICHÉ:  Objection.  Calls for

12   speculation.

13   (By Mr. Bertling)

14        Q.    It goes, Dust control methods to help prevent

15   epidemics include planting grass in dusty areas, putting

16   oil on roadways, wetting down the soil, and air

17   conditioning homes.

18              You already told us that the housing units

19   were air conditioned; is that correct?

20        A.    Yes.

21        Q.    At Safford, was there anything done like

22   putting oil on roadways or wetting down the soil?

23        A.    Putting oils on the roadway would be an

24   Environmental Protection Agency violation.  And the fact

25   that it's in this document and it's telling us to pollute
```

Page 83

```
 1    the road to keep the dust down is shocking to me.  I

 2    would never have authorized that.

 3          Q.    And what about wetting down the soil?

 4          A.    That could be done.

 5          Q.    Did you do that at Safford?

 6          A.    All the soil in the open area in the center

 7    compound was covered with rocks.
```

```
 8          Q.    But what is on the outside of Safford?

 9          A.    Desert.

10          Q.    All the desert is out there, correct?

11          A.    Uh-huh.

12          Q.    So what you did is inside the compound itself

13    there were rocks; is that correct?

14          A.    In certain areas.

15          Q.    Now, were there ever any instructions to

16    inmates that when it was windy outside that they should

17    stay inside?

18          A.    Not to my knowledge.

19          Q.    Do you know why?

20          A.    Because they have to go outside and eat and go

21    to work and they go to their religious programs, go to

22    their classes.

23          Q.    You raise a good point.  Why would they have

24    to go outside to eat?

25          A.    Because there's no dining hall in their living
```

Page 84

1    should see an outside doctor?

2        A.    No.

3        Q.    Was your oversight as warden limited to safety

4    and security measures of an inmate leaving the

5    institution?

6        A.    Yes.

7        Q.    Ms. McClintock, we discussed your role as

8    safety manager, and you discussed educating inmates about

9    hazards in institutions.  Was that specific to inmates'

10   occupations?

11       A.    Yes.  It was specific to any hazards on their

12   detail assignment.

13       Q.    So it would not involve general education to

14   the entire institution population about all potential

15   hazards?

16       A.    Correct.

17       Q.    You stressed the importance of keeping dust

18   down at FCI Safford.  I believe you mentioned putting

19   rocks in the dirt and the AC system.

20             Was there other measures in place at FCI

21   Safford that you believe kept the dust from getting into

22   the housing units?

23       A.    Yes.  We permanently secured the windows, and

24   the inmates could not open up the windows.

25       Q.    And why did you do that?

Page 98

1        A.      Because the area was being air conditioned to

2   maintain the level of comfort inside but also to prevent

3   dust from coming in through the windows.

4        Q.      You described the inspections you would do at

5   FCI Safford to keep the institution clean.  How often did

6   those inspections happen?

7        A.      When I first got there, I did them daily until

8   it got up to the standard that I wanted it to be at, and

9   then I did them once a week with my select department

10  heads and associate warden.

11       Q.      And during those inspections, would you check

12  the cleanliness of the housing units?

13       A.      Yes.

14       Q.      Would that include checking for dust?

15       A.      Yes.

16       Q.      What would you do if on your inspection there

17  was more dust than you thought was acceptable?

18       A.      I would recall the inmates -- have staff

19  recall the inmates to clean the area before they went

20  anywhere else, whether it was to their job or to recreate

21  or anywhere else in the facility.  They had to clean it

22  and pass inspection.

23       Q.      You mentioned orderlies and their roles in

24  cleaning the institution.  Were different orderlies

25  assigned to different parts of the institution?

Personal Court Reporters, A Veritext Company
818-988-1900

1    A.    Yes.

2    Q.    Did some of those areas in the institution not

3    require dust mopping?

4    A.    Yes.

5    Q.    What would some of those areas have been?

6    A.    The chapel was carpeted, so there was not dust

7    mopping there.  My area was carpeted.  There were some

8    areas that did not have hard floors so they would not be

9    dust mopping.  There were other areas in the shops where

10   they would -- they didn't dust the floors in there.

11   Q.    As warden, did you have authority to lay down

12   rocks in the dirt surrounding FCI Safford outside the

13   institution?

14   A.    No.

15   Q.    As warden, did you have the authority to wet

16   down the dust surrounding FCI Safford?

17   A.    No.  In fact, I would have been prohibited

18   from wasting the water.  We were on water conservation.

19   Q.    As warden, did you have any authority to

20   mitigate dust that originated on land outside of FCI

21   Safford?

22   A.    No.

23   Q.    If, during your time as warden, a significant

24   number of inmates had been diagnosed with valley fever,

25   would you have been alerted?

Page 100

```
 1                    MR. BERTLING:  Objection.  Lacks

 2   foundation.  Calls for speculation.

 3   (By Mr. Biché)

 4        Q.    If, during your time as warden, a significant

 5   number of inmates were diagnosed with valley fever, would

 6   you have expected to be alerted?

 7        A.    Yes.

 8        Q.    At any time during your tenure as warden, were

 9   you alerted to a significant number of inmates being

10   diagnosed with valley fever?

11        A.    No.

12                    MR. BERTLING:  Objection.  Vague and

13   ambiguous as to significant.

14   (By Mr. Biché)

15        Q.    Were there policies at FCI Safford that would

16   limit inmate movement due to high winds?

17        A.    There were procedures if there was high wind

18   that created a safety concern on the compound, such as

19   blowing objects around where someone could be struck.

20   Then we would have recalled the inmates.

21                    If there was high wind and high dust where

22   it would have affected visibility where we could not have

23   observed what was going on, we would have recalled the

24   inmates or held them in place until we had better

25   visibility.
```

Page 101

1        Q.     Was there ever a time during your tenure as

2   warden at FCI Safford where inmates were recalled because

3   high wind caused high dust that limited visibility?

4        A.     No.

5        Q.     And do you know one way or another whether

6   warnings as to valley fever were provided to inmates

7   during the A&O process?

8        A.     I don't know that they were, and I don't know

9   that they were not.  They very well could have been.

10             MR. BICHÉ:  I don't have any further

11   questions.

12             MR. BERTLING:  I just have a few follow-up

13   questions.

14                       RE-EXAMINATION

15   BY MR. BERTLING:

16        Q.     Why did you seal the windows to prevent dust

17   from coming into the housing units?

18        A.     We sealed the windows because we installed air

19   conditioning, and we didn't want the windows to be opened

20   up.  It also aided in keeping dust out of the units.

21        Q.     And did you do anything to make sure the doors

22   had seals on them so no dust could come in through the

23   bottom of the door or the sides of the door?

24        A.     My recollection of those housing units is all

25   the doors had the plates on the bottom.  I'm drawing a

Page 102

1    blank on what their name is.  But they had the plates on

2    the bottom to keep dust and snakes from coming in.

3         Q.    At least it's your expectation that that would

4    have been the case?

5         A.    Well, I went in there on a regular basis, so I

6    would have observed if they didn't have them as well.

7         Q.    Are you aware if there were situations when

8    those weren't there?

9         A.    No.

10        Q.    Would you expect that the inmates who were in

11   that housing unit would remember that?

12              MR. BICHÉ:  Objection.  Calls for

13   speculation.

14        A.    I don't understand your question.

15   (By Mr. Bertling)

16        Q.    Would you expect that the inmates who were

17   actually housed in a housing unit would know whether or

18   not those plates were in place at a given time?

19              MR. BICHÉ:  Objection.  Calls for

20   speculation.  Incomplete hypothetical.

21              But you can go ahead and answer.

22        A.    I don't.

23   (By Mr. Bertling)

24        Q.    You just made a comment earlier about dust

25   mopping wouldn't be necessary in certain areas.  For

```
 1    example, chapel is a great place because there's carpet.

 2    You don't dust mop carpet.

 3               What about in the housing units; was dust

 4    mopping necessary there?

 5        A.    Yes.

 6        Q.    Why?

 7        A.    To keep the dust down.

 8        Q.    Well, why would there be dust in the housing

 9    units?

10        A.    You get dust off of your skin, off of your

11    clothing, you track it in on your shoes.  We generate a

12    lot of dust.  Paper products.

13        Q.    And you also said that if you, as the warden

14    while you were doing your check, thought that there was

15    too much dust in the area, you would have the orderlies

16    come and clean it, or words to that effect; is that

17    correct?

18               MR. BICHÉ:  Objection.  Misstates

19    testimony.

20    (By Mr. Bertling)

21        Q.    Go ahead.

22        A.    Anything.  If there were spills that weren't

23    cleaned up.  If the showers were not cleaned adequately.

24    Yeah, it was anything, not just dust.  It could have been

25    grime.  It could have been grease.  It could have been
```

Page 104

1   blood.  Anything.  Describe anything that could be in

2   there.  If it was not clean when I did my inspections,

3   whatever people were responsible for those areas were

4   called back, and they would clean it.

5        Q.   So you would expect that the orderlies would

6   do a good job of making sure there was no dust in those

7   housing units; is that correct?

8        A.   Not necessarily because the orderlies were

9   responsible for the common areas.  Individuals were

10  responsible for their cubicles.  We didn't discuss this

11  earlier, but the majority of the unit was the

12  responsibility of the individual inmates.  The orderlies

13  cleaned the main hallway and common areas, but that was

14  the smaller portion of the floor.

15       Q.   And you would expect them to do a good job of

16  making sure that there was no dust; is that correct?

17       A.   To make sure it was clean.

18       Q.   And make sure there was no dust; is that

19  correct?

20       A.   Yes.

21            MR. BERTLING:  Ms. McClintock, thanks for

22  your time.  I have no further questions.

23            MR. BICHÉ:  I have nothing else.

24            MR. BERTLING:  Okay.  We're done.

25            (Deposition concluded at 4:25 p.m.)

                                        Page 105

```
 1                    C E R T I F I C A T E

 2    STATE OF ARIZONA )

                      ) ss.

 3    COUNTY OF PIMA   )

 4            BE IT KNOWN that I took the foregoing

 5    deposition of SUSAN GILES McCLINTOCK pursuant to Notice;

 6    that I was then and there a Certified Reporter,

 7    Certificate No. 50722, in the State of Arizona; that the

 8    witness was duly sworn by me; and that said transcript is

 9    a full, true and accurate record of the proceedings.

10

11            ( ) Signature was waived.

12            ( ) Signature was requested.

13            (X) Signature was not requested.

14

15            WITNESS MY HAND this 19th of September, 2019.

16

17

18

19

20            Bonnie J. Humm

21            Bonnie J. Humm, RPR

22            Arizona Certificate #50722

23

24

25

                                              Page 106
```