**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| OSCAR SANDOVAL, | Case No. CV 17-3092 DMG (SKx) |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

This matter is before the Court following a two-day bench trial that took place on January 14 and 15, 2020.  Peter Bertling appeared on behalf of Plaintiff Oscar Sandoval. Timothy Biché and Damon Thayer appeared on behalf of Defendant the United States. Having carefully reviewed and considered the evidence and the arguments of counsel as presented at trial, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

In addition, on February 14, 2020, Defendant filed a Motion to Dismiss ("MTD") portions of Plaintiff's Complaint as barred by the Inmate Accident Compensation Act ("IACA"), 18 U.S.C. section 4126.  [Doc. # 151.]  The Court **GRANTS in part** and **DENIES in part** Defendant's MTD.

# I.

## MOTION TO DISMISS

Defendant argues that the IACA provides the exclusive remedy for Plaintiff's claims proximately caused by his work as an orderly while incarcerated at Federal Correctional Institute ("FCI") Safford, and that the Court therefore lacks subject matter jurisdiction over those claims.   MTD at 7 [Doc. # 151].   Inmates whose claims are subject to the administrative remedies prescribed by the IACA are barred from recovery under the Federal Tort Claims Act ("FTCA").   29 C.F.R. § 301.319; *see also United States v. Demko*, 385 U.S. 149, 153 (1966) (barring a prisoner from seeking recovery for work-related injuries under the FTCA because the IACA compensation scheme serves as "an adequate substitute for a system of recovery by common-law torts").   The Ninth Circuit has highlighted that the IACA remedy "is the sole source of compensation for the injury; its remedy is exclusive." *Vander v. U.S. Dep't of Justice*, 268 F.3d 661, 663 (9th Cir. 2001). In *Vander*, where a prisoner asserted that officials provided negligent medical care after he aggravated a preexisting injury in his prison job, the Ninth Circuit held that "[w]hen a prisoner is injured on the job, he cannot bring an action against the United States under the FTCA for that injury or for negligence by United States agents regarding the treatment of that injury."   *Id.* at 664.   Though the Ninth Circuit has not explicitly stated that federal courts have no subject matter jurisdiction over FTCA claims brought by prisoners for work-related injuries, other circuits have.   *See Mays v. United States*, 567 F. App'x 81, 82 (3d Cir. 2014); *Cabello v. United States*, 427 F. App'x 398, 399 (5th Cir. 2011); *Baynes v. United States*, 302 F. App'x 334, 336 (6th Cir. 2008).

In opposition, Plaintiff cites only an unpublished District of Minnesota case to argue that the availability of IACA remedies for work-related injuries does not deprive federal courts of jurisdiction over the FTCA claim, but rather "defines the remedies available to Plaintiff."   *Spivey v. United States*, No. CIV. 11-1907 RHK (JJG), 2012 WL 3429397, at *3 (D. Minn. July 23, 2012), *report and recommendation adopted*, No. CIV. 11-1907 RHK (JJG), 2012 WL 3430270 (D. Minn. Aug. 15, 2012).   Plaintiff argues that Defendant has

-2-

waived its arguments that Plaintiff cannot seek remedy in this Court and that his FTCA claims related to contracting Valley Fever while working as an orderly should be dismissed.  Plaintiff does not contest that one of his negligence claims is specifically related to his prison job but points to evidence that he could have contracted his disease when not working.

This post-trial MTD comes far later than is generally acceptable.  But the language of 29 C.F.R. section 301.319, *Demko*, and *Vander* support Defendant's argument that this Court lacks subject matter jurisdiction over claims arising from injuries for which IACA serves as the sole system of recovery, and subject matter jurisdiction cannot be forfeited or waived. *See United States v. Cotton*, 535 U.S. 625, 630 (2002).  It appears undisputed that IACA provides the sole remedy for Plaintiff's negligence claim based on the Bureau of Prison's failure to provide him a protective mask while he worked as an orderly.  But Plaintiff's failure to warn claim is not predicated on a workplace injury and thus survives.  Accordingly, the Court **GRANTS in part** Defendant's MTD and **DISMISSES** for lack of subject matter jurisdiction Plaintiff's negligence claim based on the failure to provide a protective mask, and **DENIES in part** the MTD regarding the failure to warn claim.

## II.

### FINDINGS OF FACT[1]

**A.    Background**

1.    On February 1, 2006, Plaintiff was convicted on one count of Importation of Methamphetamine, in violation of 21 U.S.C. sections 952, 960, and one count of Possession of Methamphetamine with Intent to Distribute, in violation of 28 U.S.C. section 841(a)(1).  As a result of these convictions, Plaintiff was committed to the custody of the Bureau of Prisons ("BOP") for a term of 240 months.  Final Pretrial Conference Order ("FPTCO") at ¶ 5(a) [Doc. # 143].

---

[1] To the extent that any of the Court's findings of fact may be considered conclusions of law or vice versa, they are so deemed.

2.      From July 23, 2014 until October 29, 2015, Plaintiff was incarcerated at the FCI in Safford, Arizona ("FCI Safford"). *Id.* at ¶ 5(c).

3.      Since November 30, 2015, Plaintiff has been incarcerated at the FCI in Lompoc, California ("FCI Lompoc"). *Id.* at ¶ 5(c).

4.      FCI Safford is a low security federal prison with a population of approximately 950 male inmates.

5.      At all times relevant to this case, it was designated a "Care Level 1" facility, which means that mostly healthy inmates with limited medical needs are incarcerated there. *Id.* at ¶ 5(g).

6.      Susan McClintock was the Warden at FCI Safford between 2012 and December 2014. *Id.* at ¶ 5(n).

7.      FCI Safford is located in Graham County, Arizona, which is endemic for the naturally occurring soil fungus *Coccidioides immitis* and *Coccidioides posadasii*, hereinafter referred to as *Cocci*. *Id.* at ¶ 5(d), (f).

8.      *Cocci* causes an illness known as Coccidioidomycosis, or "Valley Fever." *Id.* at ¶ 5(d).

9.      *Cocci* spores typically enter the body through the respiratory system. *Id.* at ¶ 5(e).

10.      In an endemic area where there have been reported cases of Valley Fever, all dust is suspect because there are no definitive ways to identify or measure airborne *Cocci* spores. Trial Day 1 Tr. at 60:1-3; 66:8-14 [Doc. # 152].

11.      Most people who are exposed to *Cocci* spores do not become notably ill. FPTCO at ¶ 5(h).

12.      More than 60 percent of persons infected by *Cocci* experience no illness or symptoms at all. *Id.* at ¶ 5(i).

13.      Of the approximately 40 percent of infected persons who do exhibit symptoms, the vast majority experience a brief illness that may include manifestations such as fever, rash, and headache. *Id.* at ¶ 5(j).

14.     In approximately one percent of people who become infected, *Cocci* can "disseminate" out of their lung and spread to other parts of their bodies, such as their skin, and cause serious lifelong health problems and even be fatal. *Id.* at ¶ 5(k); Trial Day 1 Tr. at 93:16-20; Lynn Fitzgibbons Decl. at ¶ 9 [Doc. # 121-1].

15.     There are eight factors that increase the chance of a person getting Valley Fever:  (1) residence within endemic areas (longer times increases risk); (2) travel within endemic areas (longer time increases risk); (3) no previous history of infection (successful recovery from Valley Fever, even mild cases, imparts some immunity to further infection); (4) exposure to dust containing *Cocci* spores, as a result of incidental circumstances, occupation, recreation, or lifestyle; (5) duration of time spent outdoors; (6) duration of time spent in dusty conditions (inhalation of larger numbers of *Cocci* spores has been associated with more severe cases of Valley Fever); (7) activities (and duration of time) that involve intensive contact with soil in endemic areas; (8) exposure to fomites derived from endemic areas.  Peter Jaramillo Decl. at ¶ 14 [Doc. # 121-2].

16.     The more *Cocci* spores a person inhales, the greater the risk that person has of developing a more severe form of Valley Fever, including the disseminated form of the disease.  Trial Day 1 Tr. at 68:13-16, 94:2-17; 100:9-16; Fitzgibbons Decl. at ¶ 9.

17.     But if a person has only a mild form of Valley Fever, that person is at a lower risk of getting Valley Fever again.  Trial Day 2 Tr. at 176:12-16 [Doc. # 153].  The reactivation rates when medications are stopped are about 30 percent.  Antonino Catanzaro Decl. at ¶ 28 [Doc. # 127-1].

18.     There is no known cure for *Cocci*, which is primarily treated by oral azoles, a category of anti-fungal agents.  *Id.* at ¶ 27.

19.     Experts recommend wearing a properly fitted N95 mask to minimize exposure to *Cocci* spores.  Trial Day 1 Tr. at 99:3-16.  A properly fitted N95 mask can reduce chances of inhaling spores between 90 to 95 percent.  Jaramillo Decl. at ¶ 22.

20.     Experts also recommend avoiding windy conditions and staying indoors to avoid dust exposure, though spores can also be present in the air under any conditions. Trial Day 1 Tr. at 101:16-102:23; 104:13-24.

21.     The Centers for Disease Control and Prevention, the Hazard Evaluation System & Information Center, and the Arizona-based Valley Fever Center for Excellence provide information and educational materials regarding Coccidioidomycosis.   This information includes simple, common sense measures that an individual can take to avoid inhalation of cocci spores, including (1) avoiding windy conditions and staying inside with the windows and doors closed, (2) avoiding areas where they will be exposed to dust or dirt, (3) wearing an N95 respirator mask to help filter fungal spores out of the air that they breathe, and (4) avoiding recreational or work-related activities that expose them to cocci spores.  Jaramillo Decl. at ¶ 18.

22.     On October 1, 2013, Dr. Newton Kendig, then the BOP's Assistant Director of Health Services Division, sent a memo to all BOP Wardens entitled:  "Staff and inmate awareness of the infectious disease known as 'Valley Fever.'"  FPTCO at ¶ 5(l).

23.     The memo specifically listed FCI Safford as a facility where "[a]ll inmates must also be made aware of, and periodically reminded of, the signs and symptoms of Valley Fever as well as accessing health services for evaluation and treatment."  Pl.'s Trial Ex. 2.

24.     The memo states that Valley Fever is a fungal infection caused by breathing in fungus from soil and that the fungus may be inhaled due to "heavy winds, excavation, or any activity that leads to dust formation," and it lists the symptoms.  In addition, it notes that the disease may go away without treatment, but that people with disseminated disease have a high death rate.  *Id.*

25.     Dr. Kendig testified that the BOP expected that staff at FCI Safford would have been aware of *Cocci* epidemiology and prevention.  Newton Kendig Dep. at 30:03-22 [Doc. # 123-1].

26.     The memo included a "Lesson Plan" which sets forth the information regarding Valley Fever that he wanted all inmates at FCI Safford to know.  FPTCO at ¶ 5(m).

27.     Prior to his diagnosis, Plaintiff was not warned of the risk of contracting *Cocci* while at FCI Safford.  *Id.* at ¶ 5(q); *see* Oscar Sandoval Decl. at ¶¶ 7-15.

28.     FCI Safford had protective masks available that could be used as respiratory protection for inmates who were required to work in a job that exposed them to significant quantities of dust.  FPTCO at ¶(o).

29.     Plaintiff never requested a protective mask while he worked as an orderly at FCI Safford, and he was not provided one.  *Id.* at ¶ 5(r).

30.     Although Plaintiff's expert Jaramillo was not aware of studies showing that training or education has an effect on the Valley Fever infection rate specifically, he testified that as an industrial hygienist who had trained people to use personal protective equipment and avoid exposing themselves to danger, he had obtained very good results. *Id.* at 63:7-11.

31.     Jaramillo also testified that training and education are important so that if patients start experiencing symptoms of Valley Fever, they can understand the symptoms and report them early, and medical staff can address the disease and symptoms.  *Id.* at 64:11-24.  Such early treatment and monitoring would help a patient get treatment before they begin to have more severe symptoms of disseminated *Cocci*.  *Id.*; *see also id.* at 98:2-19.

32.     Due to the absence of adequate education and warnings regarding *Coccidioidomycosis* and Defendant's failure to comply with the directives in Dr. Kendig's memo, Plaintiff lost several opportunities to protect himself from massive inhalation of dust, some of which must have contained the *Cocci* spores which caused his Valley Fever. Jaramillo Decl. at ¶¶ 10-14.

## B.   Plaintiff's Diagnosis and Illness

33.   When Plaintiff was admitted to FCI Safford, he was found free of respiratory disease and was in overall good health, with no chronic diseases or prior mental health conditions.  Sandoval Decl. at ¶¶ 5-6; Catanzaro Decl. at ¶ 33.

34.   Plaintiff's initial work assignment at FCI Safford was as an orderly, which required him to clean and dust parts of the prison for 8.5 hours every Monday through Friday.  Sandoval Decl. at ¶ 17.

35.   According to Plaintiff, dust and dirt accumulated in FCI Safford's inner compound, inmate dorm rooms, walkways, and bathrooms, due to construction, open air facilities, gaps underneath his dorm door, and windy conditions.  *Id.* at ¶¶ 17-26.[2]

36.   In November 2014, Plaintiff presented himself to the FCI Safford medical department with a cough, shortness of breath, chest pain, and rashes on his face, hands, and feet.  *Id.* at ¶ 27.

37.   By December 2014, Plaintiff's symptoms had worsened, and he was diagnosed with pneumonia.  *Id.* at ¶ 28.  His symptoms improved by the next week.  Catanzaro Decl. at ¶ 36.

38.   Over the next several months, Plaintiff's symptoms recurred.  He was very concerned about his health and continued to seek medical attention at FCI Safford for his cough, shortness of breath, wheezing, rashes, chest pains, and fatigue.  Sandoval Decl. at ¶¶ 29-31.

39.   In March 2015, Plaintiff was diagnosed with *Cocci* through an immunodiffusion test and began taking Fluconazole.  FPTCO at ¶ 5(p); Catanzaro Decl. at ¶ 42.

---

[2] At trial, the Court sustained Defendant's objections to Plaintiff's statements about the construction or design of FCI Safford, claims about which the Court found barred by the FTCA's discretionary function exemption, and Plaintiff's statements about geographical conditions, on which Plaintiff is not an expert.  The Court does not rely on those statements in its factual finding.

40.     Plaintiff was the only inmate at FCI Safford diagnosed with Valley Fever in 2015.  FPTCO at ¶ 6(a).

41.     At times, FCI Safford's pharmacy did not have Fluconazole available, and Plaintiff was not given the medication prescribed.  Sandoval Decl. at ¶ 33.

42.     He continued to see various medical staff regarding his persistent symptoms, including headaches.  *Id.* at ¶¶ 34-35, 39, 41, 44. 48.

43.     In November 2015, Plaintiff was transferred to FCI Lompoc, where he is currently incarcerated.

44.     He took Fluconazole through 2016 whenever it was available.  *Id.* 50.

45.     Due to anxiety and trouble managing emotions, he saw a psychologist for the first time in July 2017.  *Id.* at ¶ 51.

46.     On August 22, 2017, Dr. James Pelton referred Plaintiff for an infectious disease consultation with a provisional diagnosis of disseminated cocci while taking 400 milligrams of Fluconazole.  Fitzgibbons Decl. at ¶¶ 5, 10.

47.     On September 13, 2017, Dr. Lynn Fitzgibbons, an infectious disease specialist, saw Plaintiff, who complained of fever, chills, shortness of breath, cough, chest pain, abdominal pain, and bloody stools.  *Id.* at ¶ 12.

48.     Plaintiff was terrified about his medical condition and needed a significant amount of counseling and reassurance.  Dr. Fitzgibbons provided him with information regarding *Cocci* infections.  *Id.*

49.     Dr. Fitzgibbons was not yet sure of a diagnosis of disseminated *Cocci* and increased Plaintiff's dose of Fluconazole from 400 to 800 milligrams.  She also ordered several laboratory tests and a chest CT scan to stage his infection, though those tests were delayed.  *Id.* at ¶¶ 14-15, 19.

50.     On December 27, 2017, Dr. Fitzgibbons received chest CT scan results showing Plaintiff had two 3mm nodules in his lower lung.  *Id.* at ¶¶ 21-22; *see* Catanzaro Decl. at ¶ 65 (showing the results of an October 2016 chest x-ray indicating possible 3 mm lung nodule and a November 2017 CT scan showing 2-3 mm lung nodules).

51.     Dr. Fitzgibbons also ordered tests for rheumatologic diseases and decreased Plaintiff's Fluconazole dose back to 400 milligrams.  Fitzgibbons Decl. at ¶¶ 21-22.

52.     In January 2018, Plaintiff was taken off Fluconazole and appeared to develop a recurrence of his *Cocci* infection.  *Id.* at ¶¶ 23-24.

53.     Several months later, he resumed taking Fluconazole, but at 600 milligrams. *Id.* at ¶ 24; Trial Day 1 Tr. at 36:3-7.

54.     On July 18, 2018, the next time Dr. Fitzgibbons saw Plaintiff, Plaintiff had fatigue, cough, joint pain, muscle pain, shortness of breath, chest pain, and three 2-millimeter papules on his left hand typical of disseminated *Cocci*.  Fitzgibbons Decl. at ¶ 24-25.

55.     She felt that his symptoms had already been alleviated by restarting Fluconazole several months before.  Trial Day 1 Tr. at 25:22-26:6; 36:3-23.

56.     Based on this recurrence of disease, skin lesions, and Plaintiff's several years of other symptoms, Dr. Fitzgibbons confirmed Plaintiff's diagnosis of disseminated *Cocci*. *Id.* at 36:13-23; 37:2-3.

57.     Dr. Fitzgibbons also testified that Plaintiff's complement fixation (CF) titer, a test for the activity of an infection caused by *Cocci*, supported her clinical diagnosis of disseminated *Cocci*.  *Id.* at 44:1-17.   Plaintiff's CF titer results were at times as high as 1:16, which is the level Dr. Fitzgibbons said she would start to worry about disseminated disease.  *Id.* at 44:4-7; *see also* Catanzaro Decl. at ¶ 64 (showing Plaintiff's CF titer measurements at 1:16 on in February and August 2017 and May 2018).  *But see* Catanzaro Decl. at ¶ 24 (stating that generally, higher CF titer results of 1:32 and greater indicate dissemination).

58.     On October 17, 2018 and March 27, 2019, Dr. Fitzgibbons again saw Plaintiff, who reported no recurrence of fever, chest pains, cough, or skin lesions, though he complained of mild intermittent joint pain which Dr. Fitzgibbons believes was related to his disseminated *Cocci*.  Trial Day 1 Tr. at 26:19-24, 27:16-17; Fitzgibbons Decl. at ¶¶ 26, 28.

59.     Dr. Fitzgibbons saw Plaintiff's minimal symptoms as evidence that his treatment with Fluconazole was adequately treating his infection and that his disease was under control.  Trial Day 1 Tr. at 27:3-10, 27:18-28:1.

60.     Plaintiff last saw Dr. Fitzgibbons on October 9, 2019, and he reported no new cough, skin lesions, headaches, or other symptoms.  *Id.* at 28:5-18.

61.     Though Plaintiff has experienced some headaches, Dr. Fitzgibbons has not found any indications that Plaintiff's *Cocci* has disseminated to his central nervous system, in which case his life expectancy could be as short as less than one year after diagnosis. *Id.* at 29:14-18; 33:24-34:4.

62.     Dr. Fitzgibbons believes that Plaintiff will indefinitely require the following medically necessary treatment for his *Cocci* infection:  (1) Plaintiff should remain on 400 to 600 milligrams of daily Fluconazole; (2) Plaintiff should see an infectious disease specialist at least every 3-6 months or sooner if there is any worsening of his *Cocci* symptoms; (3) Plaintiff should have a slate of *Cocci*-related tests performed every three months; (4) Plaintiff should follow up with his primary care physician or infectious disease specialist every three months to review the results of his lab studies and be examined; (5) Plaintiff may need radiographic studies, including chest x-rays or CT scans if his symptoms worsen; and (6) Plaintiff may need a lumbar puncture if he develops any significant symptoms of neck pain or headaches.  Fitzgibbons Decl. at ¶ 34.

63.     Patients taking Fluconazole daily, without interruption, are unlikely to suffer future complications from *Cocci*, such as central nervous system vasculitis or other infections.  Trial Day 1 Tr. at 32:3-9.

64.     If patients with disseminated *Cocci* are taken off medication, they are at risk of reactivation of their disease and future complications.  *Id.* at 30:23-31:6.

65.     Dr. Fitzgibbons believes that Plaintiff is unlikely to develop further complications if he continues to follow her recommended treatment plan, including daily Fluconazole.  *Id.* at 32:3-16.

66.     It is still possible, however, for a patient to develop symptoms despite taking Fluconazole daily, particularly if he has disseminated *Cocci*. *Id.* at 45:14-16, 46:8-47:1.

67.     Each of the eight factors contributing to increased risk of contracting *Cocci*, except the one that applies to activities involving digging, such as archaeological digs, applied to Plaintiff. *Id.* at 57:10-18.

68.     If Plaintiff had been made aware of the existence of *Cocci*, how to prevent inhaling it, and how to diagnose and treat Valley Fever, he would have taken preventative or precautionary measures.  Sandoval Decl. at ¶¶ 10-12, 14-15.

**C.     Plaintiff's Damages**

69.     Plaintiff experienced severe and distressing symptoms including abdominal pain, bloody stools, fever, chills, shortness of breath, chest pain, coughing, coughing bloody sputum, wheezing, extreme fatigue, rash, some headaches, joint pain, and muscle pain between November 2014, when he initially presented to FCI Safford's medical staff with symptoms, and September 13, 2017, when he first saw Dr. Fitzgibbons upon Dr. Pelton's recommendation.  *Id.* at ¶¶ 29-53; Fitzgibbons Decl. at ¶ 12.[3]

70.     Plaintiff was concerned and even terrified about his health in that period.  *Id.* at ¶¶ 52-53.

71.     Plaintiff began to have trouble managing his emotions and became short tempered, and he saw a psychologist for the first time in July 2017.  *Id.* at ¶ 51.

72.     On and off from November 2017 to October 2019, Plaintiff experienced cough, chest pain, fatigue, rash, and headaches.  *Id.* at ¶ 55-67.

73.     Plaintiff was particularly concerned that his disseminated *Cocci* could spread to his brain and be fatal.  *Id.* at ¶ 61.

---

[3] The Court does not rely on paragraphs 37-38, 40, 42-43, 46, and 47 of Plaintiff's declaration, which are excluded by the Court's ruling on Defendant's Motion *in Limine* No. 1.  [*See* Doc. # 106.]

74.    Plaintiff's symptoms have subsided since July 2019, but his cough flares up in cold weather.  He occasionally experiences uncontrollable coughs and chest and lung pain.  *Id.* at ¶ 67.

75.    In addition, Plaintiff currently experiences chronic fatigue.  Protracted fatigue is a frequent symptom of *Cocci* and often persists for many patients as their major complaint long after all evidence of the infection is gone.  He asserts that the constant fatigue makes it difficult for him to focus and stand up in his barber job.  *Id.* at ¶ 69.

76.    At one point, Plaintiff was restricted from playing all sports.  Trial Day 2 Tr. at 172:7-8.

77.    He has also experienced emotional distress, anxiety, and bouts of depression. Sandoval Decl. at ¶ 71.

78.    Plaintiff's criminal history is as follows.   He was first arrested in January 1989 for receiving stolen property and served a few months in juvenile hall.  Trial Day 1 Tr. at 71:24-13.  He was arrested in January 1992 for assault, convicted, and served 18 months in a state prison.  *Id.* at 73:14-23.  He was arrested in August 1993 for burglary, convicted, and sentenced to six years in prison.  *Id.* at 73:24-76:2.  He was arrested in May 2005 for importing a controlled substance, convicted, and sentenced to 240 months in federal prison—the sentence he is currently serving and which is scheduled to be completed on October 15, 2022.  *Id.* at 76:3-13; *see* Jerald Udinsky Decl. at ¶ 10 [Doc. # 124-6].  In 2008, he pleaded guilty to possession for sale of a controlled substance, for which he will serve an additional 16 months in California state prison after he completes his current federal sentence.  Trial Day 1 Tr. at 76:17-77:5.

79.    Accordingly, Plaintiff likely will not be released from prison until March 2024.  Roger Thrush Decl. at ¶ 21 [Doc. # 124-3].

80.    Plaintiff has limited work history.  He did not attend school after the age of 15, and December 2003 was the last time he held a job.  Trial Day 1 Tr. at 77:6-20.  During his incarceration, he trained himself to work as a barber and did work as an unlicensed barber for 12 years.  *Id.* at 77:21-78:4; 113:9-12.

81.     To become a licensed barber after he completes his federal and state sentences, Plaintiff would need to spend two years acquiring a California barber's license, which involves getting a pre-clearance approval from the California Board of Barbering and Cosmetology due to Plaintiff's prior incarceration and passing an exam. *Id.* 114:7-115:4; Thrush Decl. at ¶ 27.

82.     There is no medical evidence that Plaintiff will have a permanent reduction in earning capacity. Udinsky Decl. at ¶ 14. Dr. Fitzgibbons did not form an opinion about whether Plaintiff should be working limited hours. Trial Day 1 Tr. at 29:19-22 [Doc. # 152].

83.     Plaintiff's expert Jennie McNulty's calculation of his future earnings did not take into account the potential of recidivism, the negative impact of his criminal history on future employment, the fact that he will not be released from prison until 2024, the time he would need in training before becoming a barber or welder; and his lack of comparable employment history to average high school diploma holders in his demographic. Trial Day 2 Tr. at 145:12-149:24 [Doc. # 153]; Udinsky Decl. at ¶¶ 10-18, 27-28, 30-31; Thrush Decl. at ¶¶ 32-40, 44-48.

84.     Given Plaintiff's lack of employment history and the many uncertainties about his job prospects after his release from prison, the Court finds that Plaintiff's future earnings are too speculative and does not adopt any expert's calculation of future economic loss.

85.     Plaintiff's expert McNulty calculated his future medical costs as the costs of premiums and out-of-pocket expenses Plaintiff would occur if he had a Gold or Platinum HMO or PPO that covered primary care and specialist physician visits, diagnostic and imaging testing, Tier 1 through Tier 4 prescription drugs, outpatient facility and surgeon fees, emergency room care, hospitalization facility and surgeon fees, and recovery care needs, such as home health care and rehabilitation services. McNulty assumed that Plaintiff's future care needs related to his Valley Fever would be covered under these insurance policies. Jennie McNulty Decl. at ¶ 9 [Doc. # 125-1].

86.     Given Plaintiff's need for daily medication, frequent check-ups and exams, and potential for more intensive treatment if his disseminated *Cocci* flares up or spreads, the premiums and out-of-pocket payments of a comprehensive health insurance plan that covers all of Dr. Fitzgibbons' recommendations approximates Plaintiff's future medical expenses.

87.     McNulty used the monthly premiums from four insurance plans on the Covered California website to calculate the annual premium for each plan and added the average out-of-pocket expenses for each plan.  She calculated his expenses for paying those insurance premiums and out-of-pocket costs for the rest of his statistical life, which is until April 2054.  She assumed the amount per year for the rest of his life would be that same annual expense and applied a discount rate of 2.5 percent.  McNulty Decl. at ¶ 9; Trial Day 2 Tr. at 154:3-5.

88.     She did not consider his eligibility for Medicare at the age of 65 or Medi-Cal in her calculation of future medical expenses.  Trial Day 2 Tr. at 151:14-152:1.

89.     Plaintiff was born on January 23, 1975 and will be 49 years old by the time he is released from prison in March 2024.  Sandoval Decl. at ¶ 1.

90.     Because he will be eligible for Medicare at age 65, Plaintiff will need to pay annual insurance premiums and out-of-pocket costs for 16 more years in order to cover his future medical expenses associated with Valley Fever.

91.     Using Plaintiff's expert's methodology, purchasing LA Care Health Plan's Gold HMO, until Plaintiff turns 65, at the rates for a 49-year-old male in Los Angeles, with a discount rate of 2.5 percent, in present value costs $78,624.01.

### III.

### CONCLUSIONS OF LAW

**A.   Federal Tort Claims Act**

1.     Plaintiff asserts a single cause of action under the FTCA not barred by the IACA:  that Defendant was negligent because it failed to warn Plaintiff regarding the dangers of *Cocci* at FCI Stafford.

2.    No FTCA exception bars Plaintiff's failure to warn claim.  *See* Order re Mot. for Summ. J. at 14 [Doc. # 98].

3.    In an action brought pursuant to the FTCA, 28 U.S.C. § 2671 *et seq.*, the law of the place where the allegedly negligent act occurred governs the substantive law applied. *See* 28 U.S.C. § 1346(b).

4.    In this case, Arizona law applies because all of the acts or omissions alleged in Plaintiff's Complaint took place in Arizona.

5.    To have a cognizable claim under the FTCA, the claim must arise from the negligent or wrongful act of a government employee acting within the scope of his or her employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b); *Dalehite v. United States*, 346 U.S. 15, 18 (1953).

6.    Under the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.  28 U.S.C. § 2674.

7.    To establish a claim for negligence under Arizona law, a plaintiff must prove by a preponderance of the evidence "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages."  *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007) (*en banc*); *see Pfeil v. Smith*, 183 Ariz. 63, 65 (Ct. App. 1995) ("In a civil action, the burden of proof is by the preponderance of the evidence[.]").

**B.    Duty of Care**

8.    Under Arizona law, "[t]he general rule of liability for an owner or occupier to business invitees requires one 'to discover and correct or warn of hazards which the possessor should reasonably foresee as endangering an invitee.'"  *Robertson v. Sixpence Inns of Am., Inc.*, 163 Ariz. 539, 544 (1990) (*en banc*) (quoting *Markowitz v. Az. Parks*

*Bd.*, 146 Ariz. 352, 355 (1990)); *see also* Revised Arizona Jury Instruction (Civil), 6th: Premises Liability 1: Notice of Unreasonable Dangerous Condition.

9.      The relationship between jailer and prisoner is also recognized as a special relationship giving rise to a duty.  *See Bloxham v. Glock Inc.*, 203 Ariz. 271, 274 (Ct. App. 2002).

10.      The duty to protect between a jailer and prisoner is informed by a state or federal statute "reflecting public policy," which "may create a duty when a plaintiff 'is within the class of persons to be protected by the statute and the harm that occurred . . . is the risk that the statute sought to protect against.'"  *Quiroz v. ALCOA Inc.*, 243 Ariz. 560, 565 (2018*)* (quoting *Gipson*, 214 Ariz. at 146).

11.      The federal statute, 18 U.S.C. section 4042(a), states that the BOP shall "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise" and "provide for the protection . . . of all persons charged with or convicted of offenses against the United States."  18 U.S.C. §§ 4042(a)(2)-(3).

12.      This broad duty prescribed by sections 4042(a)(2) and (a)(3) "encompasses a duty to warn of the reasonably foreseeable risk of *Cocci* exposure."  Order re Mot. for Summ. J. at 16 [Doc. # 98].

13.      Defendant thus owed a duty to warn Plaintiff based on the BOP and Plaintiff's special relationship as jailer-prisoner and the BOP's statutory duty of care.

**C.      Breach of Duty**

14.      "The general test for whether a defendant's conduct breached the standard of care is whether a foreseeable risk of injury existed as a result of defendant's conduct." *Robertson*, 163 Ariz. at 544.

15.      That Plaintiff or another inmate could contract Valley Fever in an facility located in an area endemic for *Cocci* is foreseeable.  In fact, the contents of Dr. Kendig's October 2013 Memo evince Defendant's actual knowledge that prisoners at FCI Safford and other prisons in endemic areas are at higher risk for *Cocci* infection.

16.     It was therefore unreasonable for FCI Safford staff to fail to execute the BOP's own directive in the October 2013 Memo to educate staff and inmates about the origins, symptoms, and dangers of *Cocci*.

17.     Defendant breached its duty to warn Plaintiff of the foreseeable risk of *Cocci* exposure at FCI Safford.

**D.     Causation**

18.     The parties disagree on the appropriate standard of causation to apply.  *See* Pl.'s Supp. Br. [Doc. # 113]; Def.'s Response [Doc. # 117].

19.     Plaintiff requests that the Court apply the "loss of chance" doctrine, which provides that:

> One who undertakes . . . to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm . . . .

*Thompson v. Sun City Cmty. Hosp., Inc.*, 141 Ariz. 597, 608 (1984) (quoting Restatement (Second) of Torts § 323).

20.     In *Thompson*, the Arizona Supreme Court held that "even if the evidence permits only a finding that the defendant's negligence increased the risk of harm," the jury could still decide whether there is a probability that the defendant's negligence was a cause in fact of the plaintiff's injury.  141 Ariz. at 606.  The Court held, therefore,

> that because the protection of the chance interest was within the range of the duty breached by defendant and the harm which followed was the type from which the defendant was to have protected the plaintiff, the jury may be allowed to consider the increase in the chance of harm on the issue of causation.  If the jury finds that defendant's failure to exercise reasonable care increased the risk of the harm he undertook to prevent, it may from this fact find a "probability" that defendant's negligence was the cause of the damage.

1    *Id.*

2        21.    *Thompson* did not specifically limit the loss of chance doctrine to medical

3    malpractice cases.  *Lohse v. Faultner*, 176 Ariz. 253, 261 (Ct. App. 1992).

4        22.    The *Thompson* court made clear, however, that this lowered threshold to reach

5    a jury on causation applied only to "the limited class of cases in which defendant undertook

6    to protect plaintiff from a particular harm and negligently interrupted the chain of events,

7    thus increasing the risk of that harm."  141 Ariz. at 608.

8        23.    Here, by undertaking to protect prisoners and issuing guidance regarding

9    Valley Fever education and prevention to all BOP Wardens, Defendant is subject to

10   liability to Plaintiff for physical harm resulting from its failure to exercise reasonable care

11   to warn of *Cocci* if its failure to exercise such care "increase[d] the risk" of Plaintiff

12   contracting disseminated *Cocci.*

13       24.    While the overall chance of contracting *Cocci* is low, Plaintiff was

14   consistently exposed to *Cocci* throughout his time at FCI Safford and was not made aware

15   of what *Cocci* was or how he could mitigate his risk.

16       25.    Because Plaintiff was unaware that he could contract *Cocci* through inhalation

17   and did not take added precautions, he inhaled more *Cocci* spores.

18       26.    Because he inhaled more *Cocci* spores, he was more susceptible to the

19   disseminated form of the disease.

20       27.    Defendant attempted to warn Plaintiff of the dangers of *Cocci* via the October

21   2013 Memo's directives to the Warden of FCI Safford, but FCI Safford's failure to comply

22   with those directives and to warn Plaintiff "negligently interrupted th[at] chain of events."

23   141 Ariz. at 608.

24       28.    Defendant's failure to warn Plaintiff therefore increased the risk that he would

25   contract disseminated *Cocci*.

26       29.    The Court finds "from this fact a 'probability' that defendant's negligence was

27   the cause of the damage."  *Id.* at 606.

28

30.     Plaintiff would have taken added precautions had he received any warning. The experts who testified at trial recommended wearing a properly fitted N95 mask and reducing dust exposure to reduce the chance of contracting disseminated *Cocci*.

31.     Defendant thus deprived Plaintiff of a "substantial chance" of a better outcome. *Lohse*, 176 Ariz. at 261.

32.     Plaintiff has met his burden by the preponderance of the evidence to show causation under the loss of chance doctrine.

33.     But even if the loss of chance doctrine does not apply here, Plaintiff has shown causation under a typical but-for and proximate cause analysis.

34.     Regarding but-for cause, "even if defendant's conduct contributes 'only a little' to plaintiff's damages, liability exists if the damages would not have occurred but for that conduct." *Robertson*, 163 Ariz. at 546 (citation omitted).

35.     The Court acknowledges that it is possible that Plaintiff could have contracted *Cocci* even if he had been warned and took precautionary measures.  But given the direct relationship between the *quantity* of *Cocci* inhaled and dissemination of the infection, the Court finds that his *disseminated Cocci* would not have occurred but for Defendant's failure to warn.

36.     Defendant's failure to warn is thus a but-for cause of Plaintiff contracting disseminated *Cocci*.

37.     As for proximate cause, Arizona requires that the tort be "'a substantial factor in bringing about the harm.'" *Thompson v. Better-Bilt Aluminum Prod. Co.*, 171 Ariz. 550, 554 (1992) (quoting the Restatement (Second) of Torts § 431(a)).

38.     Under that definition, "[a] negligent act or omission is a substantial factor in bringing about harm if it produced the injury in a natural and continuous sequence, unbroken by any efficient intervening cause, and without which the injury would not have occurred." *Barrett v. Harris*, 207 Ariz. 374, 382 (Ct. App. 2004) (citing *Robertson*, 163 Ariz. at 546).

39.     Plaintiff credibly testified that he would have taken precautionary measures had he been warned of the dangers of *Cocci* at FCI Safford.

40.     Plaintiff's treating physician and experts credibly testified that disseminated *Cocci* is extremely rare, affecting only 1 percent of patients who have Valley Fever, and that increased exposure to dust containing *Cocci* spores increases the likelihood of contracting disseminated *Cocci*.

41.     The intervening causes Defendant has identified are the possibility that Plaintiff would not have heeded any warning or instruction regarding *Cocci*, that he would not have correctly worn an N95 mask even if he had known to wear one, and that Plaintiff could have inhaled *Cocci* when he was not engaged in any precautionary measures.

42.     But Arizona Supreme Court cases indicate that in a failure to warn case, causation may be based on evidence that the plaintiff would have heeded a warning.  In *Robertson*, the Arizona Supreme Court held that a jury could have found causation based on evidence that a plaintiff would have acted differently had he been forewarned of danger. 163 Ariz. at 546.  In another failure to warn case, the state failed to put up a sign warning of dangerous diving conditions or prohibiting diving at a cove, and the plaintiff—not knowing the cove was shallow and rocky—sustained serious and permanent injuries when he dove in.  *Markowitz v. Az. Parks Bd.*, 146 Ariz. 352, 354 (1985).  The Arizona Supreme Court held that "reasonable persons could find that if adequate warning had been given, [plaintiff] would have seen the sign and would have avoided diving."  *Id.*

43.     In addition, even if Plaintiff could have contracted *Cocci* when not taking precautionary measures, Plaintiff testified that had he know what *Cocci* and Valley Fever symptoms were, he could have promptly sought appropriate medical attention and been treated before the *Cocci* could disseminate.

44.     The Court therefore finds that Plaintiff has met his burden to show by a preponderance of the evidence that if Defendant had given adequate warning of *Cocci* at FCI Safford, Plaintiff would have altered his behavior, inhaled fewer *Cocci* spores, and not developed disseminated *Cocci*.

45.     Defendant's failure to warn Plaintiff about *Cocci* was a substantial factor in causing him to develop disseminated *Cocci*.

46.     Defendant's failure to warn is a proximate cause of Plaintiff contracting disseminated *Cocci*.

**D.     Award of Damages**

47.     "Arizona allows unlimited recovery for actual damages, expenses for past and prospective medical care, past and prospective pain and suffering, lost earnings, and diminished earning capacity." *Wendelken v. Superior Court In & For Pima Cty.*, 137 Ariz. 455, 458 (1983).

48.     "[D]amages for future pain and suffering must be reasonably certain and cannot be predicated upon conjecture and speculation." *Allen v. Devereaux*, 5 Ariz. App. 323, 326 (1967); *see also Nunsuch ex rel. Nunsuch v. United States*, 221 F. Supp. 2d 1027, 1035 (D. Ariz. 2001).

49.     It is undisputed that Plaintiff has intermittently suffered intense physical symptoms, including cough, difficulty breathing, chest pain, joint pain, muscle pain, headaches, rashes, and fatigue, for over five years.  He has also suffered emotional distress and fear of what his condition was and why it was not improving.  His condition has, however, stabilized, and his prognosis is good so long as he remains on daily Fluconazole.

50.     Plaintiff has sustained noneconomic damages of $50,000 for past and future pain and suffering.

51.     Arizona also recognizes separate general damages for hedonic damages, or "loss of enjoyment of life, that is, the participation in life's activities to the quality and extent normally enjoyed before the injury." *Ogden v. J.M. Steel Erecting, Inc.*, 201 Ariz. 32, 38 (Ct. App. 2001).

52.     Besides some evidence that Plaintiff is restricted from playing soccer and other sports he enjoys, he has not presented any other evidence of hedonic damages.  The Court therefore declines to award hedonic damages.

53.    As for pecuniary losses, under the FTCA, the Court must (1) compute the value of Plaintiff's pecuniary losses such as medical expenses under state law, (2) deduct federal and state taxes from the portion for lost earnings; and (3) discount the total award to present value.  *Shaw v. United States*, 741 F.2d 1202, 1205 (9th Cir. 1984).

54.    The Court need not engage in step 2, as Plaintiff has not proven loss of future earning capacity.

55.    In Arizona, to establish the amount of future medical expenses, a plaintiff must set forth "evidence of the probable need for and nature of the future treatment, plus evidence of the cost of that treatment."  *Saide v. Stanton*, 659 P.2d 35, 37 (Ariz. 1983).

56.    Arizona has also adopted the collateral source rule, which provides that "payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable."  *Taylor v. S. Pac. Transp. Co.*, 130 Ariz. 516, 519 (1981) (quoting Restatement (Second) of Torts § 920A(2)); *see also Lopez v. Safeway Stores, Inc.*, 212 Ariz. 198, 202 (Ct. App. 2006).

57.    Under the collateral source rule, even if Plaintiff becomes eligible for Medi-Cal at any point after he is released from prison to when he turns 65, Medi-Cal's contribution to his future medical treatment and care does not reduce Defendant's liability for Plaintiff's future medical treatment and care.  Moreover, Defendant presented no evidence that Medi-Cal would be sufficient to cover Plaintiff's healthcare needs or that Plaintiff would meet Medi-Cal's eligibility requirements.  The Court therefore finds it speculative to apply any discount to future medical expenses based on Medi-Cal eligibility.

58.    Defendant does not dispute that Plaintiff requires all of the prescriptions and care listed in Dr. Fitzgibbons' treatment plan.  Plaintiff has thus set forth proof of medical expenses beginning when he completes his prison sentences and ending when he becomes eligible for Medicare.

59.    The Court finds that the cost of private health insurance is a sufficiently certain estimate of the medically necessary costs Plaintiff will incur to treat his condition.

-23-

60.     Plaintiff will sustain future costs for medical treatment and care of $78,624.01, calculated as the cost of a private health insurance Gold HMO from the time Plaintiff is released from prison to when he turns 65, with a discount rate of 2.5 percent applied.

## IV.

## CONCLUSION

In light of the foregoing, the Court finds in favor of Plaintiff on his sole remaining count of negligence for failure to warn and awards $78,624.01 in future medical expenses and $50,000 in noneconomic damages.  The Court will enter Judgment accordingly.

DATED:  July 23, 2021

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE